**Maurice HUNTER, Plaintiff,**

v.

**ARK RESTAURANTS CORPORATION, Ark Union Station Corporation, Ark D.C. Kiosk, Inc., and David Clarke, Defendants.**

**Civil Action No. 95–766 SSH.**

United States District Court, District of Columbia.

March 31, 1998.

Neil Lawrence Henrichsen, David G. Bryton, Mitterhoff & Henrichsen, Washington, DC, for Plaintiff.

Robert Matthew Disch, John Julian Vecchione, Ross & Hardies, Washington, DC, for Defendants.

## *OPINION*

STANLEY S. HARRIS, District Judge.

This matter is before the Court on defendants' motion for summary judgment and related pleadings. In this employment discrimination action, plaintiff alleges hostile work environment in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C.Code §§ 1–2501, *et seq.* (Count I), unlawful retaliation in violation of the DCHRA (Count II), and hostile environment and unlawful retaliation in violation of 42 U.S.C. § 1981 (Count III). Defendants seek summary judgment on all counts and also move for dismissal of the suit as a sanction for plaintiff's alleged destruction of evidence. Upon consideration of the entire record, the Court grants summary judgment on Count I to defendants Ark Restaurant Corporation and David Clarke. The Court denies summary judgment on Count I as to defendants Ark D.C. Kiosk and Ark Union Station. The Court grants summary judgment to all defendants on Count II. Further, the Court grants summary judgment to defendants Ark Restaurant Corporation and David Clarke on Count III and to Ark D.C. Kiosk and Ark Union Station on the retaliation component of the § 1981 claim. The Court declines to grant summary judgment on the hostile environment component of the § 1981 claim as to defendants Ark D.C. Kiosk and Ark Union Station. The Court also declines to dismiss this action as a sanction against plaintiff.

Although "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule. . . 56," Fed.R.Civ.P. 52(a), the Court nonetheless sets forth its analysis.

## BACKGROUND.

Plaintiff, a black male, was employed as a waiter/server at a restaurant called "America," owned by defendant Ark Union Station ("Ark Union"). Plaintiff worked at America from March 5 to June 11, 1994, when he was transferred to a restaurant called "Center Cafe," owned by defendant Ark D.C. Kiosk ("Ark Kiosk"). Both Ark Union and Ark Kiosk are District of Columbia corporations and are wholly-owned subsidiaries of defendant Ark Restaurant Corporation ("Ark"). Plaintiff worked at Center Cafe from June 12 until September 18, 1994, when he quit and moved to Atlanta, Georgia. Plaintiff subsequently returned to Washington and again went to work for Center Cafe beginning on December 21, 1994, working for twenty days before quitting on January 11, 1995.

In March 1994, prior to beginning his employment, plaintiff completed America's training program and passed a written test. Shortly after he began working as a waiter, plaintiff became dissatisfied with his work assignments at America. He contends that his non-black co-workers, of equal or less tenure and experience, were routinely scheduled to work the more profitable sections of the restaurant on the more lucrative night and weekend shifts, while he continued to work primarily the less profitable sections on Monday through Thursday. Plaintiff told the assistant general manager of America and Center Cafe, Hillary Wand, that he felt management discriminated against him on account of his race. He requested more profitable work assignments, but plaintiff contends that Wand did nothing to address his concerns. Plaintiff also discussed his concerns with the general manager at America, Nancy Graefing, and thereafter he was assigned a shift upstairs. Plaintiff contends that Wand reprimanded him upon hearing of his meeting with Graefing.

In May 1994, plaintiff was still dissatisfied with his work assignments at America and asked Graefing for a transfer to Center Cafe.

Plaintiff allegedly told Graefing that his co-workers were teasing him and that management was discriminating against him with respect to scheduling. Plaintiff contends that Graefing did not address his complaints and that Wand refused to transfer plaintiff. Finally, in June, plaintiff obtained permission to transfer to Center Cafe.

At Center Cafe, plaintiff worked with defendant Clarke, a bartender who also served as an assistant manager from May 1994 until November 1994. Clarke worked approximately twenty hours a week as assistant manager. His duties included closing the restaurant and dealing with problems that occurred; however, he could not set policy or hire or fire employees. Plaintiff contends that while Clarke was acting as assistant manager, Clarke made several racist comments in his presence. Plaintiff reported these comments to Rick Blumberg, another supervisor, who acknowledged that the comments were inappropriate in the workplace and told Clarke to stop. Blumberg did not record the incident or report it to any other managers; however, Blumberg stated that he would schedule plaintiff and Clarke to work on different days.

In September 1994, plaintiff quit his job at Center Cafe to return to school in Atlanta. He soon returned to Washington, however, and resumed his job with Center Cafe. Plaintiff was assigned less desirable shifts than he had had before he quit, and he attributed this to discriminatory treatment by the management. He arranged several meetings with his immediate supervisors to discuss the situation, and eventually scheduled two meetings with Paul Gordon, Ark's regional manager. Following his discussion with plaintiff, Gordon spoke with Clarke for the first time regarding plaintiff's complaints of discrimination. The next day, Gordon again met with plaintiff and told him that "there would be changes" at America and Center Cafe, but that plaintiff would "have to accept them" or "there is no need for you to stay here." On January 11, 1995, plaintiff resigned his employment with Center Cafe. Plaintiff thereafter filed the instant action.

## STANDARD OF REVIEW

Summary judgment may only be granted if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere allegations in the pleadings, however, are not sufficient to defeat a summary judgment motion, if the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## ANALYSIS

### I. Hostile Environment Claims

■ Plaintiff alleges that defendants' actions created a hostile environment violating both the DCHRA and 42 U.S.C. § 1981. This Circuit has recognized that the same standards apply in evaluating a hostile environment claim under both Title VII and § 1981. *Hodges v. Washington Tennis Serv. Int'l, Inc.*, 870 F.Supp. 386, 387 n. 1 (D.D.C. 1994) (citing *Carter v. Duncan–Huggins, Ltd.*, 727 F.2d 1225, 1236 (D.C.Cir.1984)). Moreover, the District of Columbia Court of Appeals usually looks to Title VII as a source for interpreting the DCHRA. *Id.* (citing *American Univ. v. District of Columbia Comm'n on Human Rights*, 598 A.2d 416, 422 (D.C.1991)). The Court, therefore, evaluates plaintiff's hostile environment claims under the DCHRA and § 1981 together.

### A. Liability of Ark Kiosk and Ark Union

■ Defendants Ark Kiosk and Ark Union first argue that they are entitled to summary

judgment on plaintiff's hostile environment claims because they took prompt remedial action in response to plaintiff's complaints of racial discrimination. In this Circuit, "an employer may not be held liable for a supervisor's hostile work environment harassment if the employer is able to establish that it had adopted policies and implemented measures such that the victimized employee either knew or should have known that the employer did not tolerate such conduct and that she could report it to the employer without fear of adverse consequences." *Gary v. Long*, 59 F.3d 1391, 1398 (D.C.Cir.1995), *cert. denied,* 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995). This remedial defense, however, depends on "the ability of the employer to establish that its employees could not reasonably have failed to know of those measures and that its grievance procedures were clearly 'calculated to encourage victims of harassment to come forward.'" *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 73, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ Construing the facts in the light most favorable to plaintiff, the Court concludes that there is an issue of material fact regarding whether defendants took appropriate remedial action. Defendants contend that their company manual explicitly stated that racially discriminatory conduct was not tolerated in the workplace, and that management attempted to rectify plaintiff's working conditions after each complaint. The mere existence of a restaurant policy, however, does not eliminate potential "employer's chargeability." Defendants have failed to establish that their ad hoc responses to plaintiff's complaints were part of a system of measures "calculated to encourage victims of harassment to come forward." *Id.* 477 U.S. at 73, 106 S.Ct. 2399. Therefore, the Court rejects defendants' argument that the statements regarding racial discrimination in the company manual preclude plaintiff's claims of hostile environment.[1]

Defendants further argue that even if they are not entitled to summary judgment on the hostile environment claim under the

---

1. To the extent that defendants rely on their asserted prompt remedial action as a basis for summary judgment for the entire action, the

Court also must reject that argument because issues of material fact remain in dispute.

DCHRA, summary judgment should be granted on plaintiff's § 1981 hostile environment claim because plaintiff misrepresented his background in applying for the position and thus fraudulently entered into an employment contract. Defendants contend that plaintiff's misrepresentations resulted in a void contract, which neither party could enforce, and thus defendants were free to terminate the employment relationship without any potential § 1981 liability. *See Fair Employment Council of Greater Wash., Inc. v. BMC Marketing Corp.,* 28 F.3d 1268, 1271 (D.C.Cir.1994).

 The Court rejects defendants' argument. Even if the defendants could prove the elements of a voidable contract, they could not avoid potential § 1981 liability.[2] In *McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), the Supreme Court ruled that an employee was not barred from relief under the Age Discrimination in Employment Act, even though, after her discharge, her employer discovered wrongdoing that would have been a legitimate ground for termination had the employer known of it. *See id.* 513 U.S. at 357–59, 115 S.Ct. 879. After-acquired evidence does not bar recovery because "[t]he employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was

fired for the nondiscriminatory reason." *Id.* 513 U.S. at 360. The Supreme Court's holding in *McKennon* applies to various statutes intended to eliminate workplace discrimination. As amended in 1991, a purpose of § 1981 is to deter and eliminate workplace discrimination.[3] It would frustrate the congressional scheme protecting employees from workplace discrimination if defendants were able to use after-acquired evidence of wrongdoing to defeat a suit. *See id.* at 358. Thus, the Court concludes that plaintiff's misrepresentations do not erase the possibility of § 1981 liability.

### B. Liability of Clarke

 Plaintiff contends that a proper claim exists against defendant Clarke under § 1981 and the DCHRA because of his supervisory role at the restaurant. Although a supervisory employee may be joined as a party defendant in a § 1981 action, that employee is sued in his capacity as an agent of the employer, not in his individual capacity. *See Gary,* 59 F.3d at 1398–99 (Title VII); *Nelson–Cole v. Borg–Warner Security Corp.,* 881 F.Supp. 71, 73 (D.D.C.1995) (same). Therefore, Clarke cannot be held liable in his individual capacity, and plaintiff's claim against Clarke allegedly for violating § 1981 merges with his claim against Ark Kiosk and

2. A genuine issue of material fact exists as to whether plaintiff's employment contract was voidable. In order to prove that a contract is voidable, a party must not only show a misrepresentation, but also show that the misrepresentation was fraudulent or material, and that the misrepresentation induced the recipient justifiably to rely on it. *See* Restatement (Second) of Contracts § 164. Though defendants have indicated several errors in plaintiff's resumé, they have failed to establish that they relied on the misrepresentations, especially considering that the misrepresentations did not have to do with plaintiff's waiting experience. This is particularly true since plaintiff has proffered evidence that though another employee misrepresented his work experience in his resumé, defendants still hired him after they learned of the misrepresentation.

3. Defendants argue that *McKennon* is inapplicable to § 1981 suits because § 1981 deals with contract rights. The *McKennon* Court listed several statutes enacted as "part of a wider statutory scheme to protect employees in the workplace

nationwide." *Id.* 513 U.S. at 358, 115 S.Ct. 879. Although the Court did not list § 1981 as an example of the statutory scheme, the Civil Rights Act of 1991, which explicitly overruled the Supreme Court's decision in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (limiting § 1981 liability to pre-contract formation conduct), expanded § 1981 to protect against "race discrimination in all phases of the contractual relationship." Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (codified as amended at 42 U.S.C. § 1981(b) (1994)). Congress expanded the definition of "make and enforce":

> (b) For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981; *see also Weeks v. Coury,* 951 F.Supp. 1264, 1277 (S.D.Tex.1996) (applying the after-acquired evidence doctrine to § 1981 case); *McCray v. DPC Indus., Inc.,* 875 F.Supp. 384, 392 (E.D.Tex.1995) (same).

Ark Union. *See Gary,* 59 F.3d at 1399. Accordingly, the Court grants summary judgment to Clarke on the § 1981 hostile work environment claim.

Defendants further contend that because the D.C. Court of Appeals usually looks to Title VII and § 1981 in interpreting provisions of the DCHRA, plaintiff's DCHRA claims against defendant Clarke should also be dismissed. Plaintiff counters that the recent D.C. Court of Appeals decision in *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 1998 WL 12571 at *13 (D.C.1998), which held that "[o]n its face, Section 1–2512(a) [the DCHRA] makes discriminatory conduct unlawful without regard to who engages in it," requires that the Court allow plaintiff's DCHRA claims against defendant Clarke to proceed.

■ Ordinarily, "[i]n adjudicating a case under state law ... [a federal court] is not free to impose [its] own view of what state law should be; rather, [it is] to apply existing state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issues before [the federal court]." *Koppers Co. v. Aetna Casualty and Surety Co.,* 98 F.3d 1440, 1444 (3d Cir.1996); *see generally Steorts v. American Airlines, Inc.,* 647 F.2d 194, 196 (D.C.Cir.1981) (noting that the relationship of the federal to the local judiciary in the District of Columbia is akin to that historically existent in the states); *United States v. Gower,* 503 F.2d 189, 191 (D.C.Cir. 1974). However, even if the state's highest court has decided an issue, a federal court sitting in diversity need not follow that decision "if it can be said with some assurance that [the state supreme court] will not follow [the decision] in the future." *Meredith v. City of Winter Haven,* 320 U.S. 228, 234, 64 S.Ct. 7, 88 L.Ed. 9 (1943); *see also New Hampshire Ins. Co. v. Vieira,* 930 F.2d 696, 701 (9th Cir.1991) (noting that if a federal court is "convinced by 'persuasive data that the highest court of the state would decide otherwise,' " the court is not bound by that decision) (quoting *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940)); *M.A.S., Inc. v. Van Curler Broadcasting Corp.,* 357 F.Supp. 686, 691–92 (D.D.C.1973) (holding that the court "need not follow the [District of Columbia Court of Appeals'] decision where, in view of factors not considered in the ... opinion, it appears that the District of Columbia Court of Appeals itself would not follow that decision"). Upon consideration of the D.C. Court of Appeals' opinion in *Wallace* and this Court's own independent research, the Court concludes that this issue falls within the narrow exception to the rule that a federal court should follow the decisions of the highest state court interpreting a state law.

In *Wallace,* the D.C. Court of Appeals for the first time squarely addressed the issue of whether supervisors or co-workers may be held individually liable under the DCHRA. In holding that the DCHRA allowed for individual supervisor and co-worker liability, the D.C. Court of Appeals cited two differences between Title VII and the DCHRA: (1) the operative provisions of the two statutes; and (2) the differences in the definition of an employer in the two statutes. *Wallace,* 1998 WL 12571 at *13. It is the opinion of this Court that the first difference—the difference in the operative provisions of the two statutes—was critical to the D.C. Court of Appeals' decision. According to the D.C. Court of Appeals:

> [T]he operative provision of Title VII states that "[i]t shall be an unlawful employment practice for an *employer* [to engage in prohibited discriminatory practices]." 42 U.S.C. § 2000e–2(a) (emphasis added). The corresponding provision of the Human Rights Act states simply that "[i]t shall be an unlawful discriminatory practice to do any of the following [prohibited] acts ...." D.C.Code § 1–2512(a). The reach of the Human Rights Act is thus not limited, at least expressly, to employers. Anyone who engages in the proscribed conduct may be liable.

*Id.* After discussing the other difference between the statutes—the definition of an employer—the D.C. Court of Appeals concluded that "[t]he omission of the word 'employer' from Section 1–2512(a) is obviously not conclusive, but any ambiguity should be resolved in favor of coverage .... [o]n its face, Section 1–2512(a) makes discriminatory conduct

unlawful without regard to who engages in it." *Id.*

It is the D.C. Court of Appeals' heavy reliance upon the omission of the word "employer" from the operative provision of the DCHRA which compels this Court to evaluate the *Wallace* decision with care. It has come to the Court's attention that the 1981 edition of the District of Columbia Code (upon which the D.C. Court of Appeals apparently relied) does not limit the listed prohibited conduct to "employers," not because the statute is intended to encompass discriminatory conduct by anyone in the workplace, but rather because of a publishing error. Section 1–2512(a) as passed reads as follows:

> (a) *General.*—It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race [or] color ... of any individual:
>
> > (1) *By an employe[r].*[4]—To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee; ....

D.C.Code § 1–2512(a) (1997 Supp.). The Editor's Note to § 1–2512 in the 1997 Supplement acknowledges that "[t]his section is set out above in full to correct the omission of subsection headings in the 1981 Edition." Thus, although the D.C. Court of Appeals' reliance upon the text of § 1–2512(a) from the 1981 published edition of the D.C.Code which omitted the limiting phrase "[b]y an employer" was understandable, it was erroneous and thus affects the value of that opinion as precedent.[5]

Moreover, the Court concludes that, in light of the erroneous premise on which the *Wallace* decision was based and the true text of the operative provisions of the DCHRA, the D.C. Court of Appeals itself would not follow that decision. *Cf. M.A.S., Inc.,* 357 F.Supp. at 691–92. As previously discussed, the Court is convinced that the omission of the word "employer" from § 1–2512 was the controlling factor in the D.C. Court of Appeals' conclusion that the DCHRA provides for supervisor and co-worker liability. The D.C. Court of Appeals acknowledged that its interpretation of the DCHRA was problematic because "[i]f the prohibition against discrimination was not limited to employers, then the definition of 'employer' might be viewed as redundant." *Wallace,* 1998 WL 12571 at *13 n. 30. Nevertheless, due to the omission of the word "employer" from the operative provision of the DCHRA, the D.C. Court of Appeals felt compelled to hold that the statute extended liability to supervisors and co-workers. *Id.* at *13. Now that it is clear that the statute does in fact contain the limiting provision "[b]y an employer," making it much more similar to Title VII, this Court is convinced that the D.C. Court of Appeals would follow the logic it expressed in footnote 30 of the *Wallace* opinion (and the clear majority of courts which have concluded that Title VII liability is limited to employers) and conclude, under the facts of this case, that liability under the DCHRA does not extend to employees such as defendant Clarke. *Compare* 42 U.S.C. § 2000e–2(a) *with* D.C.Code § 1–2512(a); *see also Hodges,* 870 F.Supp. at 387 (holding that the DCHRA does not create a cognizable claim against a co-worker); *Wallace,* 1998 WL 12571 at *13 (noting that a clear majority of the federal courts of appeals have concluded that individual employees cannot be held liable under Title VII). Accordingly, defendants' motion for summary judgment on the DCHRA claims against defendant Clarke is granted.

---

4. The 1997 Supplement actually says "employee." However, the Court contacted the publisher and confirmed that it should read "employer."

5. In order to ensure that the headings have always been a part of the statute (as opposed to being a prospective amendment to the statute subsequent to the incident at issue in *Wallace*), the Court contacted the company responsible for publishing the D.C.Code. Its representative confirmed that the headings have always been a part of § 1–2512 and simply were omitted from the published version.

### C. Liability of Ark

■ Plaintiff contends that Ark may be liable for hostile environment because Ark, Ark Union, and Ark Kiosk are interrelated and should be treated as joint employers. For guidance in testing the degree of interrelationship, the Court looks to the four-part test formulated by the National Labor Relations Board and approved by the Supreme Court in *Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Serv. of Mobile, Inc.*, 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965). *See EEOC v. St. Francis Xavier Parochial Sch.*, 928 F.Supp. 29, 33 (D.D.C.1996) (noting that courts apply the *Radio Union* test in Title VII and related cases), *rev'd on other grounds*, 117 F.3d 621 (D.C.Cir.1997). In determining whether separate corporations can be considered a single employer, the Court considers (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. *Radio Union*, 380 U.S. at 256, 85 S.Ct. 876; *St. Francis Xavier*, 928 F.Supp. at 33. "Although the absence or presence of any single factor is not conclusive, control over the elements of labor relations is a central concern." *St. Francis*, 928 F.Supp. at 33 (citing *Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir.1983)). Moreover:

> Plaintiff must make a substantial showing to warrant a finding of single employer status. There must be 'sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer.'

*Id.* (quoting *Armbruster*, 711 F.2d at 1332).

### 1. *Interrelation of Operations:*

■ Combined accounting records, bank accounts, lines of credit, payroll preparation, telephone numbers, or offices are all indicia of interrelatedness. *See id.; Western Union Corp.*, 224 N.L.R.B. 274 (1976), *aff'd*, 571 F.2d 665 (D.C.Cir.), *cert. denied*, 439 U.S. 827, 99 S.Ct. 101, 58 L.Ed.2d 121 (1978). Plaintiff contends that Ark closely monitored the activities of Ark Union and Ark Kiosk in terms of financial and management control, pointing out that (1) the checks drawn on America's and Center Cafe's bank accounts can be printed on Ark's computers in New York City, (2) all Ark-owned restaurants use a standard disciplinary write-up form and training manual, (3) Ark's 1994 10-K form included its two subsidiaries, and (4) employees occasionally transferred between Ark-owned restaurants. There is no suggestion, however, of shared budgets or the integration of daily operations. Despite the fact that there may be a common source of check printing, plaintiff indicates that the subsidiaries maintain separate bank accounts. The 10-K form indicates only common ownership, not the interrelation of daily operations. Further, the three entities are located in different buildings and are operated by different staffs. Finally, "the occasional interchange of employees [is a] relatively insubstantial indic[ation] of a common relationship." *Fike v. Gold Kist, Inc.*, 514 F.Supp. 722, 726 (N.D.Ala.) (quoting *International Union of Operating Engineers*, 169 N.L.R.B. 184 (1968)), *aff'd*, 664 F.2d 295 (11th Cir. 1981). Thus, the Court concludes that, even considering the evidence in the light most favorable to plaintiff, there is insufficient evidence to warrant a finding of interrelation of operations.

### 2. *Common Management:*

■ In establishing whether there is common management, the Court focuses on the existence of common directors and officers who exercise control over the daily operations and employment practices of the entities. *See St. Francis*, 928 F.Supp. at 34; *Fike*, 514 F.Supp. at 727. Here, two of the officers and directors of Ark are also directors and officers of Ark Union and Ark Kiosk. Also, there is a regional manager who oversees the operations of all Ark restaurants in the area, and a common general manager for Center Cafe and America. Plaintiff, however, has not established that the two directors common to Ark and Ark Union and Ark Kiosk effectively control the daily operation of either Center Cafe or America. The directors' sole managerial decision was to hire the above-mentioned general manager to oversee the operations of

both restaurants. It is the general manager who is responsible for hiring, firing, and disciplining employees. The regional manager, who is also the general manager at a third Ark-owned restaurant, oversees all Ark restaurants in D.C. and Virginia, but he does not control the daily operations of America or Center Cafe. Different managers control the daily operations and employment practices at each of the three entities; plaintiff has thus failed to allege that "one corporation ran the other in a direct, hands-on fashion, establishing the operating practices and management practices." *St. Francis*, 928 F.Supp. at 34; *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241 (2d Cir.1995). Therefore, there is no showing of common management between Ark and its subsidiaries.

### 3. *Centralized Control of Labor*

■ It is well settled that the "control" required to meet the test of centralized control of labor relations is not potential control, but rather actual and active control of day-to-day labor practices. *St. Francis Xavier*, 928 F.Supp. at 34. Here, plaintiff has not established such control. Although there is a regional manager and a general manager for both America and Center Cafe, the entities have separate employees and employment practices that dictate the hiring, firing, and disciplining of employees. Plaintiff argues that, on several occasions, the managers of the Ark-owned D.C. subsidiary restaurants have placed employees with other Ark-owned restaurants in D.C., and that several employees work for both restaurants. This occasional employee interchange suggests a relationship between Center Cafe and America, but it does not involve any direct action by Ark. Moreover, even if Ark were involved, the occasional transfer of employees is insufficient to establish control of labor, absent other evidence that Ark had active control over day-to-day labor practices. *See Fike*, 514 F.Supp. at 726–27; *cf. Armbruster*, 711 F.2d at 1338 (finding control of labor when employees were routinely transferred between corporations).

### 4. *Common Ownership or Financial Control*

■ Defendants do not dispute Ark's ownership of Center Cafe and America. In the absence of the other factors, however, "common ownership is not determinative where common control is not shown." *United Telegraph Workers v. NLRB*, 571 F.2d 665, 667 (D.C.Cir.), *cert. denied*, 439 U.S. 827, 99 S.Ct. 101, 58 L.Ed.2d 121 (1978). This is particularly true since common ownership of subsidiaries by a parent corporation is a characteristic of corporate enterprise. As previously discussed, plaintiff has failed to establish Ark's control over the operations of either restaurant. Further, plaintiff has not alleged that Ark exercises a significant measure of financial control over Center Cafe and America.[6]

■ Consequently, the Court concludes that the single-employer doctrine does not apply. Mutually convenient employment and business arrangements among the corporations do not detract from their corporate independence. *See Fike*, 514 F.Supp. at 727. Accordingly, the Court grants summary judgment on the hostile environment claims against Ark.[7]

### II. **Retaliation Claims**

■ Plaintiff asserts that defendants violated both § 1981 and the DCHRA by retaliating against him for complaining to

**6.** A plaintiff can demonstrate financial control when "one corporation 'handled' the other's accounts receivable, provided it with administrative backup, handled its payroll and cash accounting, monitored all sales shipments, and kept its bank accounts near the headquarters even though the corporation was in another state." *Armbruster*, 711 F.2d at 1338–39; *see also St. Francis*, 928 F.Supp. at 35.

**7.** Plaintiff also argues that Ark should be directly liable for Center Cafe and America because the two restaurants lost the privileges of corporate status when management failed to file an annual report for two consecutive years. *See* D.C.Code § 29–399.24. However, § 29–399.24(d) provides that the corporate form shall be retained for a term of three years for litigation purposes. Further, once the corporations were reinstated, the corporations regained the powers and rights they had before the proclamation was issued. *See id.* § 29–399.28. Moreover, both corporations were in good standing when plaintiff worked for them.

management about allegedly discriminatory employment policies and practices. Plaintiff contends that defendants retaliated by verbally reprimanding him, refusing to address his complaints, and constructively discharging him from his employment.[8]

In order to prevail on his retaliation claims, plaintiff must present evidence establishing: "(1) that plaintiff engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two .... [i.e.] facts adequate to permit an inference of retaliatory motive." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985); *Stoeckel v. Environmental Mgmt. Sys., Inc.*, 882 F.Supp. 1106, 1116 (D.D.C.1995). Once plaintiff has established a prima facie case, the burden of proof shifts to the employer to articulate a nondiscriminatory reason for its actions; plaintiff then has an opportunity to show that the employer's reasons are pretextual. *Mitchell*, 759 F.2d at 86.

Here, plaintiff has not presented a prima facie case of retaliation. Plaintiff alleges that his supervisors scolded him for complaining, filed disciplinary write-ups against him, and failed to remedy the discriminatory workplace. Plaintiff, however, fails to allege facts that indicate he suffered a "demonstrably adverse employment consequence" from any of these allegedly retaliatory actions. *Milburn v. West*, 854 F.Supp. 1, 14 (D.D.C.1994), *aff'd sub nom. Walker v. West*, 1995 WL 117983 (D.C.Cir.1995). For example, though plaintiff contends that every time a supervisor informally reprimanded him for a work-related issue, it was in retaliation for his complaints of discrimination, he does not allege these informal reprimands adversely affected his employment position; in fact plaintiff admitted that following several complaints to supervisors "nothing changed." Despite plaintiff's complaints, both restaurants cooperated with plaintiff

and granted his requests to transfer and increase his shifts, and even rehired him after he quit. The supervisors' conduct towards plaintiff did not change following his complaints, rather, his employment status and the workplace environment remained the same.

Plaintiff attempts to remedy this defect in his claim by alleging that he was constructively discharged. In order to establish constructive discharge, plaintiff "must show, not only discrimination, but also that 'the employer deliberately [made] working conditions intolerable and [drove] the employee into an involuntary quit.'" *Katradis v. Dav–El*, 846 F.2d 1482, 1485 (D.C.Cir. 1988) (quoting *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1101 (D.C.1986)); *Ryczek v. Guest Servs., Inc.*, 877 F.Supp. 754, 763 (D.D.C.1995). The Court concludes that plaintiff has not alleged facts sufficient to establish constructive discharge. The record does not depict intolerable working conditions that would drive a reasonable person to quit. *See Katradis*, 846 F.2d at 1485; *Ryczek*, 877 F.Supp. at 763. Plaintiff first quit working at Center Cafe on September 18, 1994, in order to return to school in Atlanta, but he returned to the restaurant three months later. After being rehired, plaintiff worked for twenty days before quitting again. Plaintiff makes vague allegations of discrimination during this period, including complaints about his schedule, but nothing which the Court can conceive would amount to intolerable working conditions. Plaintiff quit after a meeting with Gordon, the regional manager of the restaurants, when he was told that there would be changes and he would have to accept them. Gordon's statements do not demonstrate intolerable working conditions or the presence of aggravating factors. Accordingly, the Court grants summary judgment for all defendants on the retaliation claims under both § 1981 and the DCHRA.[9]

---

8. As previously mentioned, the Court refers to Title VII as a source for interpreting a retaliation claim under both § 1981 and the DCHRA. The elements of a retaliation claim under the DCHRA are the same as under federal employment discrimination laws. *Beckwith v. Career Blazers Learning Ctr. of Washington, D.C., Inc.*, 946

F.Supp. 1035, 1041 (D.D.C.1996) (citing *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C.1994)).

9. Summary judgment in favor of Ark and Clarke would also be justified for the reasons previously

## III. Dismissal as Sanction for Destruction of Evidence

██ Plaintiff discarded notes that he took on the alleged discriminatory actions. Defendants contend that the case should be dismissed as a sanction against plaintiff because he destroyed written records that described the alleged discrimination. The Court's power to sanction the destruction of evidence derives from Federal Rule of Civil Procedure 37 and from the Court's inherent powers. *See Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 70 (S.D.N.Y.1991). Dismissal, however, is reserved for those circumstances where the litigant is on notice that the documents are relevant to potential litigation, and the destruction deprives a party of the opportunity to present critical evidence on key claims. *See William T. Thompson Co. v. General Nutrition Corp.,* 593 F.Supp. 1443 (C.D.Cal.1984); *Bowmar Instrument Corp. v. Texas Instrument, Inc.,* 25 Fed. R. Serv.2d 423, 427, 1977 WL 22799 (D.Ind.1977).

██ Here, plaintiff's actions do not warrant a sanction or dismissal. Plaintiff disposed of the notes when he quit working at Center Cafe for the first time to return to school; this was several months before plaintiff filed suit. This Court will not speculate about plaintiff's reasons for disposing of the notes, but observes that when he disposed of them, there was no hint of litigation or a reason for plaintiff to retain the notes. The Court thus denies defendants' motion for dismissal based on plaintiff's destruction of his notes months before he filed this suit.[10]

## CONCLUSION

The Court grants summary judgment to defendants Ark and Clarke as to Count I, hostile environment in violation of the DCHRA. The Court denies summary judgment to defendants Ark Kiosk and Ark Union on Count I. Next, the Court grants summary judgment to all defendants on Count II, retaliation in violation of the DCHRA. Further, the Court grants sum-

mary judgment to defendants Ark and Clarke as to Count III, § 1981. The Court denies summary judgment to defendants Ark Union and Ark Kiosk on the hostile environment component of plaintiff's § 1981 claim, but grants it as to the retaliation component. Finally, the Court denies defendants motion to dismiss based upon plaintiff's alleged destruction of evidence. An appropriate Order accompanies this Opinion.

### *ORDER*

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that defendants' motion for summary judgment is granted with respect to defendants Ark Restaurant Corporation and David Clarke on all counts of the complaint. It hereby further is

ORDERED, that defendants' motion for summary judgment is granted with respect to defendants Ark D.C. Kiosk and Ark Union Station on Count II and that part of Count III claiming retaliation. It hereby further is

ORDERED, that defendants' motion for summary judgment is denied with respect to defendants Ark Union Station and Ark D.C. Kiosk on Count I and that part of Count III claiming hostile environment. It hereby further is

ORDERED, that defendants' motion for dismissal as a sanction for plaintiff's destruction of evidence is denied.

SO ORDERED.

---

discussed regarding plaintiff's hostile environment claims.

**10.** The Court observes, however, that it may be appropriate to instruct the jury to draw an adverse inference from plaintiff's destruction of the notes.