**James R. SHEPPARD, Plaintiff,**

v.

**DICKSTEIN, SHAPIRO, MORIN & OSHINSKY, et al., Defendants.**

**No. Civ. 98–2422–RCL.**

United States District Court,
District of Columbia.

July 7, 1999.

Camille C. McKinney, Cooper & Associates, P.C., Washington, DC, for plaintiff.

Deborah P. Kelly, Dickstein Shapiro Morin & Oshinsky, L.L.P., Washington, DC, for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on defendants' motion to dismiss Counts II and III of the complaint filed by plaintiff James R. Sheppard. Specifically, defendants move to dismiss Count II, based on 42 U.S.C. § 1981, and Count III, which is based on tortious interference with contractual relations. Upon consideration of the written submissions of the parties, and the relevant law, defendants' motion to dismiss the claim under 42 U.S.C. § 1981 is denied. Defendants' motion to dismiss the claim based on tortious interference with contractual relations is granted.

### I. Background

#### A. Introduction

Plaintiff, an African–American male, brings this action to recover damages for injuries he suffered as a result of discriminatory employment practices by defendants Dickstein, Shapiro, Morin & Oshinsky ("Dickstein"); Ms. Sharon O'Meara ("O'Meara"); Tyanna Ertter ("Ertter"); and Natalie Bernstein ("Bernstein"). Dickstein is the law firm where plaintiff worked, while the remaining defendants were plaintiff's supervisors. Plaintiff alleges that defendant Dickstein has violated Title VII through its actions. Dickstein has not moved to dismiss that claim. Further, plaintiff alleges that all defendants violated his rights under 42 U.S.C. § 1981, and that defendants O'Meara, Ertter, and Bernstein tortiously interfered with his employment relationship and economic advantage with Dickstein. Defendants oppose both these claims in their motion to dismiss.

#### B. Employment Position With Dickstein

Plaintiff was employed as a Records Manager at Dickstein from July 1996 until July 9, 1997. Plaintiff was an at-will employee, whose employment could be terminated at any time by either party. Dickstein offered plaintiff employment when his previous employer, Anderson Kill Olick Oshinsky ("Anderson Kill") merged with Dickstein. Plaintiff began his employment with Anderson Kill in 1993, and was promoted to Records Manager in June 1995. Throughout his employment at Anderson Kill, plaintiff's performance was considered excellent.

After the merger, plaintiff's position at Dickstein entailed the same duties as he performed at Anderson Kill. Plaintiff was primarily responsible for maintaining a database of all active and inactive client records. Plaintiff continued to work with many of the same support staff and attorneys that he worked with at Anderson Kill. However, plaintiff was no longer managed by the same immediate supervisor.

After the merger, Dickstein renovated its offices. During this period, only plaintiff and two other managers, who were white females, were constantly moved and shuffled between several different office spaces. Of the three, plaintiff was the only manager assigned a small, windowless room for training. Conversely, the other two managers were given window offices. The other support staff managers were not moved during the renovation and were assigned window offices.

#### C. Allegations of Racial Statements By Supervisors

Plaintiff alleges that his supervisors made several racially biased statements during his employment. Specifically, plaintiff recalls suggesting where defendant Ertter, his supervisor, asked plaintiff to interview a part-time Dickstein employee who was interested in a full-time position. Defendant Ertter allegedly attacked the intelligence of the employee, an Afri-

can–American, and asked plaintiff to determine if the employee was "trainable."

Further, plaintiff asserts that defendant Ertter made other allegedly racially biased remarks. Specifically, plaintiff recalls an incident where he suggested that the storage supervisor, an African–American male, learn the computer software system to facilitate data entry of files in storage. Ertter responded that the employee was incapable of performing simple tasks, and that "we should take it one day at a time. It took him a year to learn how to log-in." *See* Pl.Comp. at 5.

Plaintiff contends that racially biased statements were also made by defendant O'Meara, his other supervisor. During a job search for a relief receptionist, O'Meara was approached by a Dickstein employee to consider an internal, African–American candidate who worked part-time in the firm's supply department. Plaintiff asserts that O'Meara would not consider the candidate, stating that he was "too black" for the job. *See* Pl.Comp. at 6.

### D. Salary Increase

In January 1997, plaintiff received an annual increase in salary of approximately four percent. Plaintiff submits evidence that four percent was the maximum pay increase Dickstein employees received that year. In June 1997, plaintiff was offered another position with a law firm at a substantial increase in salary. Upon learning this, plaintiff asserts that many of the attorneys with whom he worked with at Anderson Kill actively sought to keep him employed at Dickstein. Plaintiff requested a raise and other employment concessions to remain at Dickstein. Dickstein agreed to these concessions, including a substantial pay raise.

### E. Explanation And Problems With RMS Software

Prior to plaintiff's employment with Dickstein, the firm purchased a records management software program ("RMS") from MDY Advanced Technologies, Inc.

("MDY"), a computer service company. As Records Manager, plaintiff was assigned the task of implementing the RMS software firm-wide to automate Dickstein's client records and files. Plaintiff was trained on the RMS software by an MDY representative. Plaintiff contends that he had an excellent knowledge of the RMS software and was the only employee at Dickstein to use the software on a daily basis. Plaintiff also trained several employees to use the RMS software.

Dickstein encountered several problems with the RMS software. For example, the Insurance Practice Group could not utilize the software because the group utilized an extensive WordPerfect index to organize their client files. Dickstein also encountered problems involving the numbering of consecutive volumes of pleadings files. Finally, Dickstein encountered "bugs" in the RMS system, which would abruptly terminate the RMS system during data entry into the database. Plaintiff contends that MDY either delayed in solving these problems, or did not solve them at all. Despite these deficiencies, plaintiff was able to successfully automate the file records of the Civil Litigation Practice Group.

### F. RMS Demonstration With MDY

In June 1997, Miriam Kramer ("Kramer"), an MDY representative, called plaintiff and asked if they could give a demonstration of the RMS software at Dickstein to the law firm of Arent Fox Kintner Plotkin & Kahn ("Arent Fox") as a courtesy. Plaintiff asserts that his job duties and responsibilities at Dickstein did not require him to promote MDY's products or to demonstrate MDY's services to rival law firms.

Plaintiff obtained approval from his supervisor, defendant Ertter, and from Fran Durako, Director of Information Services at Dickstein before he agreed to allow MDY to demonstrate their RMS software. MDY scheduled the presentation for July 8, 1997. On that day, both the MDY and

Arent Fox representatives arrived for the presentation and met in plaintiff's office. At that point, the MDY representatives asked plaintiff to give the presentation. Plaintiff states that he was surprised by this request because he believed that MDY would conduct the demonstration of its own RMS software.

Plaintiff contends that he agreed to give the demonstration because he did not want to embarrass MDY and because he had obtained approval for the demonstration from his supervisor, defendant Ertter. At all times, plaintiff asserts that he gave the demonstration in a neutral and competent manner, thoroughly explaining the basics of the system and its capabilities as a record management system for client files and documents. Plaintiff states that none of the individuals in attendance indicated any dissatisfaction with his presentation.

### G. Termination Of Plaintiff

The next day, defendant O'Meara suggested a meeting with plaintiff. Defendants Ertter and Bernstein were also present at this meeting. O'Meara informed plaintiff that his employment at Dickstein would be terminated, because the MDY representatives allegedly reported to Dickstein that plaintiff did not have the "skills to perform rudimentary operations on the system" and that he lacked "knowledge of the system." *See* Pl.Comp. at 9. Further, defendants claim that they terminated plaintiff because MDY was concerned about a "conflict of interest" arising from plaintiff's part-time employment with Accutrac, a computer software company.

However, plaintiff submits evidence that there were no business connections between MDY and Dickstein other than providing computer software and service, and that Dickstein was not privy to any confi-

dential information regarding MDY's business practices. Further, plaintiff submits evidence that he told O'Meara about his part-time employment in May 1997, and that O'Meara did not express any concern about plaintiff's position with Accutrac.

In fact, plaintiff submits evidence that Dickstein allowed defendant O'Meara to engage in activities that created a conflict-of-interest and did not similarly discipline defendant. Specifically, Dickstein selected Capital Legal Copies ("CLC") as a vendor of the firm even though Dickstein was aware that David Tallant, O'Meara's husband, was also the manager of Corporate Services for CLC.

### II. Defendants' Motion To Dismiss 42 U.S.C. § 1981 Claim

### A. Introduction

Defendants bring this motion to dismiss plaintiff's claim under 42 U.S.C. § 1981 on two separate grounds. First, defendants contend that the "make and enforce" clause of 42 U.S.C. § 1981 does not apply to plaintiff because he was an at-will employee. Second, defendants contend that the "equal benefits" clause of 42 U.S.C. § 1981 does not apply because it requires state action, which is lacking here. To succeed on their motion to dismiss, defendants must prove that neither theory under 42 U.S.C. § 1981 applies to plaintiff's claims. Defendants' motion to dismiss on the ground that the "make and enforce" clause of 42 U.S.C. § 1981 does not apply to at-will employees be denied. Consequently, it is unnecessary for this Court to rule on the defendants' second ground, i.e,. whether the equal benefits clause requires state action [1].

### B. Motion To Dismiss

Dismissal is appropriate "only if 'it is clear that no relief can be granted under

---

**1.** Most courts have held that "the equal benefits" clause does not extend to private discrimination, and thus, requires state action. *See Provisional Government of Republic of New Afrika v. American Broadcasting Compa-* *nies, Inc.,* 609 F.Supp. 104, 109 (D.D.C.1985); *Mahone v. Waddle,* 564 F.2d 1018 (3d Cir. 1977); *Spencer v. Casavilla,* 839 F.Supp. 1014 (S.D.N.Y.1993). The Supreme Court has not ruled specifically on this issue.

any set of facts that could be proven consistent with the allegations.'" *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Martin v. Ezeagu*, 816 F.Supp. 20, 23 (D.D.C.1993). In evaluating a motion to dismiss, the court must construe the complaint in the light most favorable to plaintiff and give plaintiff "the benefit of all inferences that can be derived from the facts alleged." *See Schuler v. United States*, 617 F.2d 605, 608 (D.C.Cir.1979).

### C. At–Will Employees Are Covered Under The "Make and Enforce" Clause

#### 1. Supreme Court and Congressional Treatment

42 U.S.C. § 1981(a) contains two major clauses the contracts clause (the right to "make and enforce contracts") and the equal benefits clause (the right to "full and equal benefits of all laws"). 42 U.S.C. § 1981(a) reads as follows:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Before 1991, the Supreme Court had held that the "make and enforce" clause was not triggered unless there was an actual contract between the respective parties. *See Patterson v. McLean*, 491 U.S. 164, 176–77, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Runyon v. McCrary*, 427 U.S. 160, 175, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). However, Congress overruled that part of *Patterson* when it enacted the Civil Rights Act of 1991. *See* H.R.Rep No. 102–40(I), at 18 and 89, *reprinted in* 1991 U.S.C.C.A.N. 549, 556, 627. The amendments by Congress were intended to make the scope of Section 1981 coextensive with that of Title VII. Specifically, Congress added a new subsection (b) to Section 1981 that states:

"For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship".

42 U.S.C. § 1981(b).

#### 2. Circuit Cases Discussing At–Will Employees Coverage Under Section 1981

Whether an at-will employee can maintain an action under 42 U.S.C. § 1981 is a matter of first impression in this jurisdiction. Further, this issue has not been widely addressed by the circuits. *See Jones v. Becker Group of O'Fallon Div.*, 38 F.Supp.2d 793, 796 (E.D.Mo.1999). Those that have addressed it are split. *See Fadeyi v. Planned Parenthood Assoc. of Lubbock, Inc.*, 160 F.3d 1048 (5th Cir.1998) (at-will employee has a "contractual relationship" sufficient to maintain an action under § 1981); *Byers v. The Dallas Morning News*, 1999 WL 20953 (N.D.Tex.1999) (under Texas law, at-will employee has a contractual relationship). *But see Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025 (7th Cir.1998) (noting, but not specifically holding, that under Illinois law an at-will employee fails to have contractual rights necessary to maintain a claim under § 1981); *Moorer v. Grumman Aerospace Corp.*, 964 F.Supp. 665, (E.D.N.Y.1997) (at-will employee cannot establish contractual relationship necessary to support a § 1981 cause of action), *aff'd*, 162 F.3d 1148 (2d. Cir.1998) (unpublished).

The Fourth Circuit has recently held that at-will employees can maintain an action under 42 U.S.C. § 1981. *See Spriggs v. Diamond Auto Glass*, 165 F.3d 1015

(4th Cir.1999)[2]. In so holding, the court focused primarily on the fact that Maryland courts recognize at-will employment relationships as contracts. *See id.* at 1017. Therefore, the plaintiff's relationship, though terminable at will, was contractual. *See id.* at 1018. Further, the Court held, after reviewing *Patterson* and the text and legislative history of the 1991 Civil Rights Act, that Congress could not have meant to exclude at-will workers from the reach of section 1981. *See id.* (quoting *Fadeyi v. Planned Parenthood,* 160 F.3d 1048, 1052 (5th Cir.1998)).

### 3. District Of Columbia Recognizes At-Will Agreements As Contracts

██ It is well settled that the District of Columbia views at-will employment as a species of contract. *See Rinck v. Association of Reserve City Bankers,* 676 A.2d 12, 15 (D.C.App.1996) ("There is a presumption that a hiring not accompanied by an expression of a specific term of duration creates an employment relationship terminable at will by either party at any time."); *Minihan v. American Pharmaceutical Ass'n,* 812 F.2d 726, 727 (D.C.Cir. 1987) ("It is well settled District of Columbia law that in the absence of clearly expressed contrary intent, 'the assumption will be that even though [the parties] speak in terms of "permanent" employment—the parties have in mind merely the ordinary business *contract* for a continuing employment, terminable at the will of either party.'" (emphasis added)); *Carl v. Children's Hosp.,* 702 A.2d 159, 162 (D.C.App.1997) ("This court has long and consistently adhered to the rule that employment is presumed to be at will, unless the *contract* of employment expressly provides otherwise." (emphasis added)).

### 4. Analysis

██ From this line of cases, one can see that District of Columbia law does treat at-will agreements as contracts. Consequently, this Court adopts the line of reasoning in *Spriggs.* Whether specific state law treats at-will agreements as contracts seems to be a controlling factor in deciding whether these agreements are covered under § 1981. For instance, in holding that at-will employees are not covered under § 1981, the *Jones* court focused exclusively on the fact that the "Missouri Supreme Court has made it clear that a statement of duration is an essential element to an employment contract." *Jones,* 38 F.Supp.2d at 796 (quoting *Luethans v. Washington Univ.,* 894 S.W.2d 169, 172 (Mo.1995)). That is not the case here. District of Columbia law states that there is a presumption of at-will employment and states nothing about duration as an essential element to an employment contract.

The defendants' motion to dismiss the 42 U.S.C. § 1981 on the ground that at-will employees are not covered is DENIED. The controlling factor in the Circuit decisions appears to be whether state law treats at-will employment agreements as contracts. Through the aforementioned line of cases, District of Columbia law treats at-will agreements as contracts, and therefore an at-will employee can maintain a cause of action under the "make and enforce" clause of 42 U.S.C. § 1981.

### III. Individual Defendants Can Be Sued Under 42 U.S.C. § 1981

### A. Introduction

In their reply brief, defendants contend that plaintiff cannot sustain a § 1981 claim against individually named defendants O'Meara, Ertter, and Bernstein. In his surreply, plaintiff contends that defendants are estopped from raising this argument at this late juncture. *See, e.g., Cronin v. Federal Aviation Admin.,* 73 F.3d 1126 (D.C.Cir.1996) ("This court will not

**2.** The defendants rely on the district court's ruling in their brief, which was overturned by the Fourth Circuit's ruling in February 1999.

entertain arguments raised for the first time in a party's reply brief."). Plaintiff's contention here is incorrect, as *Cronin* dealt only with arguments raised at the *appellate* level, and did not address whether these arguments would be impermissible at the *trial* level, particularly when adequate opportunity exists (and is freely given) for filing a surreply. Therefore, this Court will address the merits of defendant's contention.

### B. Individual Supervisors Can Be Sued Directly Under 42 U.S.C. § 1981

#### 1. Discussion Of Applicable Law

There appears to be a conflict in this jurisdiction as to whether individual supervisors can be sued directly under 42 U.S.C. § 1981. To support their contention, defendants rely specifically on case law stating that, although a supervisory employee may be joined as a party defendant in a § 1981 action, that employee is sued in his capacity as an agent of the employer, not in his individual capacity. *See Hunter v. Ark Restaurants*, 3 F.Supp.2d 9, 15 (D.D.C.1998). In that holding, the *Hunter* court followed the lead of Title VII cases that have treated individual supervisor liability in the same manner. *See Gary v. Long*, 59 F.3d 1391, 1398–99 (D.C.Cir. 1995); *Nelson–Cole v. Borg–Warner Security Corp.*, 881 F.Supp. 71, 73 (D.D.C. 1995).

Conversely, plaintiff cites to case law holding that officers, directors, and employees of a corporation may become personally liable when they intentionally cause an infringement of the rights secured by § 1981, regardless of whether the corporation may be held liable. *See Weaver v. Gross*, 605 F.Supp. 210, 212 (D.D.C.1985); *Richard v. Bell Atlantic Corp.*, 946 F.Supp. 54, 74 (D.D.C.1996). Further, plaintiff contends that the holding in *Hunter* is incorrect, as it relied specifically on Title VII cases to conclude that individual supervisors are not liable under § 1981.

#### 2. Analysis

■ The court here adopts the plaintiff's contention. First, the *Hunter* court did rely solely on the Title VII holdings in holding that individual supervisors were not liable under § 1981. That seems problematic, considering the differences between the two statutes. Specifically, section 1981 "has been recognized to prohibit racial discrimination in the making and enforcement of purely private contracts as a valid exercise of Congress' power under the Thirteenth Amendment to eradicate the badges and incidents of slavery." *Weaver*, 605 F.Supp. at 211. In contrast, Title VII was created to address discriminatory conduct in the workplace only. Further, the statutory language of Title VII makes it clear that only "employers" are liable for discriminatory acts. *See* 42 U.S.C. § 2000e(b). In contrast, 42 U.S.C. § 1981 makes no such distinction.

For the foregoing reasons, and based on the case law cited by plaintiff, the Court holds that individual supervisors can be sued under 42 U.S.C. § 1981. Consequently, the individual defendants will not be dismissed from the plaintiff's claim under § 1981.

### IV. Defendants' Motion To Dismiss Tortious Interference With Economic Advantage Claim

#### A. Introduction

Plaintiff asserts that defendants O'Meara, Ertter, and Bernstein knowingly, intentionally, and maliciously interfered with plaintiff's employment at Dickstein. Consequently, plaintiff asserts that defendants tortiously interfered with his reasonable expectation of continued employment and financial remuneration from Dickstein.

#### B. Standards For Tortious Interference With Prospective Advantage And Economic Relationship

■ The Court of Appeals has held that, in order to establish a claim for tortious

interference with economic advantage, a plaintiff must show: (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach of termination of the relationship or expectancy, and (4) resultant damage. *See Bennett Enters. v. Domino's Pizza, Inc.*, 45 F.3d 493, 498 (D.C.Cir. 1995).

To survive a motion to dismiss for intentional interference with prospective economic advantage, "a plaintiff must allege 'business expectancies, not grounded in present contractual relationships, but which are commercially reasonable to expect.'" *See Democratic State Comm. of the District of Columbia v. Bebchick*, 706 A.2d 569, 572 (D.C.1998) (quoting *Carr v. Brown*, 395 A.2d 79, 84 (D.C.1978)). In *Carr*, the court defined the term "expectancies": "For the most pan the 'expectancies' thus protected have been those of future contractual relations, such as the prospect of obtaining employment or employees, or the opportunity to obtain customers." *Carr*, 395 A.2d at 84 (citation omitted).

A general intent to interfere or knowledge that the conduct will injure the plaintiff's business dealings is insufficient to impose liability. *See Bennett Enters.*, 45 F.3d at 499 (quoting *Genetic Sys. Corp., v. Abbott Labs.*, 691 F.Supp. 407, 423 (D.D.C.1988)). Plaintiff cannot demonstrate liability without "a strong showing of intent to disrupt ongoing business relations." *Id.* "Motive or purpose to disrupt ongoing business relationships is of central concern in a tortious interference case.... [C]onduct must be more egregious, for example, it must involve libel, slander, physical coercion, fraud, misrepresenta-

tion, or disparagement." *Genetic Sys.*, 691 F.Supp. at 423.

## C. Analysis

Defendants' motion to dismiss this claim will be granted for the following reasons. First, plaintiff has failed to identify any facts demonstrating any future business relations or "expectancies" that defendants affected. Plaintiff has only presented evidence that defendants may have interfered with business expectations associated with his current employment relationship, and plaintiff has not presented evidence of a specific, future relationship with Dickstein.

Even assuming that plaintiff could demonstrate that future business expectancies were affected by defendants, plaintiff cannot demonstrate the requisite intent required for tortious interference with economic advantage. Under *Genetic Systems*, the requisite intent is met if behavior involves egregious conduct, such as libel, slander, physical coercion, and fraud. Here, plaintiff's complaint is silent as to defendants' intent to interfere with plaintiff's future business relations or to any statements that constitute slander, libel, or misrepresentations or that disparage plaintiff in his search for new employment. Therefore, plaintiff cannot sustain a claim that defendants terminated him with the specific intent to interfere with "future contractual relations" or the "prospect of obtaining employment."

Defendants O'Meara, Ertter, and Bernstein's motion to dismiss on this ground will be GRANTED[3]. First, plaintiff has offered no evidence of a future business relationship with Dickstein. Second, even assuming that plaintiff could demonstrate a future expectancy, he has offered no evidence of the requisite intent required to

---

3. Plaintiff's reliance on Maryland case law to refute defendants' assertion is misplaced. That is not the controlling law of this jurisdiction. Further, defendants' reliance on a Supreme Court ruling, *see Haddle v. Garrison,* 525 U.S. 121, 119 S.Ct. 489, 142 L.Ed.2d 502 (1998), is inapplicable. *Haddle* does not address tortious interference with economic advantage.

satisfy the test for tortious interference with economic advantage.

## V. Conclusion

For these reasons, the court will deny defendants' motion to dismiss the 42 U.S.C. § 1981 claim brought by James R. Sheppard. The court will grant defendants O'Meara, Ertter, and Bernstein's motion to dismiss the claim based on tortious interference with economic advantage.